J-A26004-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| JOHNNY COLLINS | |
| Appellant | No. 1711 MDA 2016 |

Appeal from the Judgment of Sentence May 23, 2016
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0005009-2014

BEFORE:  BOWES, OLSON, AND RANSOM, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED FEBRUARY 13, 2018**

Johnny Collins challenges the judgment of sentence of life imprisonment imposed following his convictions for first degree murder and carrying a firearm without a license.  We affirm.

The trial court thoroughly summarized the facts presented to the jury in its Pa.R.A.P. 1925(a) opinion, which we adopt herein.

> The Commonwealth's first witness was India Thompson-Beatty, who was living in Hall Manor on June 3, 2014.  Ms. Thompson-Beatty heard the gun shots and generally described the scene of the crime.  Officer Nicholas Ishman, of the Harrisburg Police Department was on duty the night of the crime and was called to the scene.  Officer Ishman rode in the back of the ambulance with the victim (later identified as Daylynn Smith)[.] Doctor Wayne Ross, a forensic pathologist in the Dauphin County Coroner's Office . . . testified that the victim died from the gunshot wound to the back.

Officer Karen Lyda, a forensic investigator with the Harrisburg Police, arrived in Hall Manor to process the scene . . . [she] also executed a search warrant at the Defendant's residence and discovered a .9mm [handgun], a rifle, and a shotgun. Finally, Officer Lyda testified to the different brands of casings that were found inside the .9mm gun. . . . the shell casings found at the scene were not fired from the same gun that was found in Defendant's home.

Alyssa Honaker, who was dating the victim at the time of the incident, was with Daylynn the night prior to his murder. Ms. Honaker and Daylynn went to a local grocery where a group of individuals threatened Daylynn. Two of the younger men came over and asked Daylynn why he ripped off their friend and what happened to all the money. An argument ensued and one of the young men yelled "if they ever seen him [Daylynn] out the south again they were going to shoot him." Ms. Honaker saw them again that night, standing outside a white SUV. This SUV followed her and Daylynn and continued to honk the horn. Ms. Honaker recognized the Defendant as one of the individuals and pointed to him in the courtroom.

Ayinda Harper was arrested on July 1, 2014, the same day as the Defendant. Mr. Harper and the Defendant shared the same booking cell. Mr. Harper testified that the Defendant told him that "[t]hey didn't find the gun that I did it with." Mr. Harper also indicated that the Defendant shot the victim because of drug money. Mr. Harper identified the Defendant as the same person that he shared a booking cell with.

Satara Dickey was partying with the victim on the night of the murder. Daylynn had left to go get food. Shortly thereafter, so did Ms. Dickey. While she was out getting food, she ran into Daylynn at the Hall Manor play-ground. Ms. Dickey talked to Daylynn for a couple of minutes but noticed that Daylynn appeared to be in a rush. After she walked away, she heard gun shots but did not see the shooter. However, Ms. Dickey did notice someone with a gun wearing a hoodie and shorts. In a discussion with Detective Neal, Ms. Dickey described the shooter as someone who had dreads and appeared to be no older than 21 years of age. The Commonwealth also introduced Commonwealth's Exhibit 25 which was a photo lineup with the

Defendant's picture. This photo lineup showed a picture circled of the Defendant that Satara had signed. . . .

The Commonwealth's next witness was a minor (hereinafter T.R.) who was hanging out in Hall Manor on the day of the incident. He noticed an individual 'hanging out' with Mi[c]cah Green. This individual was short and had braids/dreads. Mi[c]cah Green's testimony was read into the record. Mr. Green was leaving his house when he ran into the Defendant. He decided to walk with the Defendant and when Mr. Green encountered a group of kids, Mr. Green stopped to talk to them about basketball. He noticed that the Defendant walked off. Mr. Green heard the shots fired and noticed that the Defendant was the one who fired the shots. Mr. Green also saw Daylynn running when he was shot. Mr. Green also saw the Defendant put a gun in his pants and leave. A stipulation regarding Mr. Green's medical history was also read into the record.

Trial Court Opinion, 12/29/16, at 4-7 (footnotes and citations to transcript omitted).

No direct appeal was filed, but Appellant's direct appeal rights were reinstated *nunc pro tunc* through the PCRA on September 27, 2016. Appellant filed a timely notice of appeal and a concise statement as ordered. The trial court authored a twenty-eight page opinion in response, and the matter is now ready for our review. Appellant raises ten claims of error:

1. Whether the trial court abused its discretion when it denied Appellant's motion to dismiss matter with prejudice pursuant to Pa.R.Crim.P. Rule 600?

2. Whether the evidence presented by the Commonwealth at trial was not sufficient to prove the charge of homicide and carrying a firearm without a license beyond a reasonable doubt?

3. Whether the trial court abused its discretion when it admitted Alyssa Honaker's hearsay testimony pursuant to Pa.R.Evid. Rule 404?

4. Did the trial court abuse its discretion when it denied Appellant's motions for new trial based on the weight of the evidence for the offenses of homicide and carrying a firearm without a license because the verdict was so contrary to the evidence to shock one's sense of justice?

5. Whether the trial court erred on its legal conclusions regarding the denial of appellant's motion to suppress Satara Carter's (a.k.a Satara Dickey) out of court identification of the appellant?

6. Whether the trial court abused its discretion when it determined that appellant validly waived **Miranda** warnings and admitted Appellant's statements?

7. Whether the trial court erred when it determined that Appellant's counsel had a fair and full opportunity to cross examine Miccah Green at the preliminary hearing?

8. Whether the trial court abused its discretion when it allowed the Commonwealth to add a medical conclusion without expert testimony regarding appellant's proposed stipulation relating to Miccah Green's medical records?

9. Whether the trial court erred in not granting appellant's motion for a mistrial when the Commonwealth introduced evidence from the Appellant's other criminal matter for which he was already convicted?

10. Whether the trial court abused its discretion when it allowed the Commonwealth to present evidence of a .9mm firearm recovered by law enforcement in the Appellant's residence at the time of the Appellant's arrest and did not sever the offense of carrying a firearm without a license from the homicide offense?

Appellant's brief at 16-17.[1]

---

[1] Appellant's statement of questions presented calls to mind the view of the often quoted Honorable Ruggero J. Aldisert of the United States Court of Appeals for the Third Circuit regarding this shotgun approach to appellate advocacy:
*(Footnote Continued Next Page)*

The Honorable Richard A. Lewis issued a thorough Pa.R.A.P. 1925(a) opinion responding to these claims, which we adopt as our own for issues two, three, four, five, and seven as indicated in the writing.

Our standard and scope of review in evaluating Rule 600 issues is well-settled. We determine

> whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.
>
> The proper scope of review is limited to the evidence on the record of the Rule [600] evidentiary hearing, and the findings of the [trial] court. An appellate court must view the facts in the light most favorable to the prevailing party.

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

> With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to **any** of them . . . [and] it is [this] presumption . . . that reduces the effectiveness of appellate advocacy.

*Commonwealth v. Robinson*, 864 A.2d 460, 480, n.28 (Pa. 2004) (quoting Aldisert, "The Appellate Bar: Professional Competence and Professional Responsibility–A View From the Jaundiced Eye of the Appellate Judge," 11 Cap. U.L. Rev. 445, 458 (1982) (emphasis in original)).

- 5 -

***Commonwealth v. Armstrong***, 74 A.3d 228, 234 (Pa.Super. 2013) (citing ***Commonwealth v. Ramos***, 936 A.2d 1097, 1099 (Pa.Super. 2007) (*en banc*) (alterations in original due to rule renumbering)). "The proper application of discretion requires adherence to the law, and we exercise plenary review of legal questions." ***Commonwealth v. Baird***, 975 A.2d 1113, 1118 (Pa. 2009) (citing ***Commonwealth v. Chamberlain***, 731 A.2d 593, 595 (Pa. 1999)). Where the Commonwealth's due diligence is at issue, we apply the following principle:

> As has been oft stated, "[d]ue diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort."

***Commonwealth v. Bradford***, 46 A.3d 693, 701–02 (Pa. 2012) (quoting ***Commonwealth v. Selenski***, 994 A.2d 1083, 1089 (Pa. 2010)).

Rule 600 requires the Commonwealth to try a defendant within one year of filing the complaint. Pa.R.Crim.P.600(A)(2)(a) ("Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed."). The written complaint was filed on July 1, 2014. Therefore, the Commonwealth was required to try Appellant on or before July 1, 2015. The jury trial commenced April 18, 2016, which was 657 days after the complaint was filed, and 292 days longer than the one-year period allotted by Rule 600.

The Rule states that "When a defendant has not been brought to trial within the time periods set forth in paragraph (A) . . . [he] may file a written motion requesting that the charges be dismissed with prejudice[.]" Pa.R.Crim.P 600(D)(1). Of course, the mere fact that more than 365 days had elapsed by that point does not settle the matter, as there is a particular method for calculating "the time within which trial must commence":

(C) Computation of Time

(1) For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation.

Pa.R.Crim.P. 600. "[T]he inquiry for a judge in determining whether there is a violation of the time periods in paragraph (A) is whether the delay is caused solely by the Commonwealth when the Commonwealth has failed to exercise due diligence." Comment, Pa.R.Crim.P. 600. Additionally, "When the defendant or the defense has been instrumental in causing the delay, the period of delay will be excluded from computation of time." *Id*. (citing *Ramos*, *supra*).

The Commonwealth and Appellant alike have not adequately set forth the numerous delays, which party caused those delays, and, where the delay was caused by the Commonwealth, whether it exercised due diligence. Appellant sets forth the following argument in his brief:

> On April 18, 2016, undersigned counsel filed a Motion to Dismiss the matter pursuant to Pa.R.Crim.P. Rule 600. Undersigned counsel outlined in detail the calculation from when the matter was initiated by the filing of the criminal complaint . . . . Undersigned counsel provided a thorough calculation for the record and the trial court to show that the Commonwealth had clearly violated Pa.R.Crim.P. Rule 600.

Appellant's brief at 27-28.

Unfortunately, the criminal docket fails to reflect this motion and the certified electronic record similarly does not contain any Rule 600 motion.[2] Therefore, the Rule 600 calculations, which Appellant has apparently attempted to incorporate by reference, are simply not before this Court. While we decline to do so, we would be justified in finding this claim waived for the failure to develop and support his claim.

Nor is the Commonwealth free from blame. Despite the motion's absence from the docket and certified record, the Commonwealth was aware of the Rule 600 motion as the prosecutor informed the trial court, on the day of trial, that "[W]e have two outstanding motions. One is the Commonwealth's motion to use the preliminary hearing transcript of Miccah Green, and the other is defense counsel's Rule 600 motion." N.T., 4/18-

_____

[2] "If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears[.]" Pa.R.A.P. 2119(c). Appellant's failure to follow this Rule is a recurring issue as his brief rarely cites to the portions of the record.

21/16, at 1. The Commonwealth briefly presented testimony regarding its efforts to locate witness Miccah Green. With respect to the Rule 600 issue, the Commonwealth argued the following:

> We calculated the expiration of Rule 600 to be approximately April 12th of this year. It's now April 18th, a difference of six days. Essentially the Commonwealth's argument, Your Honor, is that this is delay not attributable to the Commonwealth. The Commonwealth has gone above and beyond in showing its due diligence in order to locate this very crucial witness. You know, obviously, he is one very important witness given that Satara Dickey is somebody who is also now going south on us or not identifying the Defendant.
>
> It's all been very well detailed in the Commonwealth's motion and Detective Neal's testimony. We've been all across the US looking for Miccah Green and to this day have been unable to find him. But those efforts, Judge, have been ongoing and they have been continuous. In other words, the Commonwealth hasn't at any point let this case just fall by the wayside.

*Id*. at 24. The trial court accepted the Commonwealth's calculations.

> THE COURT: . . . I'm going to adopt the Commonwealth's time frame that Rule 600, if at all, expired no more than six days ago, and in the interest of justice, I'm going to allow the case to proceed to trial. So your motion for dismissal based upon speedy trial is dismissed.

*Id*. at 26.

Appellant states that he is entitled to relief because the Commonwealth "conceded they violated Pa.Rule 600 on the record on April 12, 2016." Appellant's brief at 28. He also faults the trial court for "merely accept[ing] the Commonwealth's calculations, even though the

- 9 -

Commonwealth provided no insight as to how they arrived at April 12, 2016." *Id*.

In response, the Commonwealth's brief sets forth a Rule 600 calculation that differs from its representation to the trial court, also without any citations to the record.

> Collins claims that the Commonwealth conceded a rule 600 violation; however, that is not the case. At argument regarding the Rule 600 motion on April 18th, the Commonwealth stated that its current calculation had April 12th as the approximate expiration of Rule 600, but argued that the delay was not attributable to the Commonwealth and that the Commonwealth acted with due diligence. The trial court decided that in the interest of justice, Collins would proceed to trial. The trial court did not abuse its discretion in coming to this conclusion.
>
> Additionally, after further review of the record, it appears that the run date did not expire prior to the April 18th, 2016, commencement of trial. The criminal information was filed on July 1, 2014, making the original run date June 30, 2015. The first preliminary hearing was rescheduled by the court from July 7th to August 28th, causing 48 days of delay and setting the new run date to August 17, 2015. Collins requested a continuance of his preliminary hearing, from September 5, 2014, to September 26, 2014. This 21 day delay set the new run date to September 7, 2015. Collins requested a continuance from March 2, 2015, to June 1, 2015. This 91–day delay set the new run date to December 7, 2015. Starting on June 1, 2015, there is a continuance requested by Collins, as well as various motions filed by Collins, which were not resolved until December 7, 2015. This 189-day delay set the new run date to May 13, 2016. All of the above mentioned delay was beyond the control of the Commonwealth. The trial commenced on April 18, 2016, which is before the new run date of May 13, 2016. There is additional delay when the Commonwealth was attempting to locate Green which could also affect the run date since the Commonwealth acted with due diligence in trying to locate Green.

Commonwealth's brief at 10-11.

We are confused by the Commonwealth's assertion that the trial court did not commit an abuse of discretion by accepting its entirely unsupported run date calculation submitted at the Rule 600 hearing, while simultaneously offering a completely different calculation in its brief. If the true run date was no earlier than May 13, 2016, then the trial court by definition erred when it concluded otherwise at the Rule 600 hearing. The Commonwealth also fails to provide any textual support for its theory that the trial court was permitted to proceed "in the interests of justice" despite agreeing that Rule 600 was violated. Finally, the Commonwealth fails to provide citations to the record regarding the delays, nor does it cite any law.

Turning to the trial court's opinion, we do not agree with parts of its analysis. We agree that the court erred by analyzing whether Appellant was prejudiced. The trial court opinion cites **Commonwealth v. Smalis**, 592 A.2d 669 (Pa. 1991), for the proposition that "Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." **Id**. at 672 (quoting **Barker v. Wingo**, 407 U.S. 514, 532 (1972)). However, **Smalis** concerned the resumption of trial following lengthy delays occasioned by appeals, and the quotation was addressing a **constitutional** claim regarding the right to a speedy trial. In contrast, Appellant's claim herein concerns application of the rule-based right to a speedy trial. Excepting the situation in which a timely trial under Rule 600 is prevented by the unavailability of a courtroom, **See e.g.**

- 11 -

*Commonwealth v. Spence*, 627 A.2d 1176 (Pa. 1993), a Rule 600 violation cannot be excused on a *de minimis* theory. *See Commonwealth v. Lewis*, 804 A.2d 671, 672 (Pa.Super. 2002) (affirming dismissal of homicide case pursuant to Rule 600, where trial commenced four days after adjusted run date). Indeed, excusing a Rule 600 violation on *de minimis* grounds defeats its prophylactic purpose.

Nevertheless, we find that Appellant is not entitled to relief. We set forth the following. The magisterial docket sheet states that Appellant's preliminary hearing was postponed at his request from July 11, 2014, to August 28, 2014, a total of forty-eight days. On the latter date the hearing was again postponed but the docketing sheet lists the reason as "other" and we therefore will not count that delay against Appellant. Next, on September 5, 2014, Appellant requested a postponement to September 26, 2014. This delay of twenty-one days, when added to the earlier delay, equals sixty-nine days.

Once the matter was in the Court of Common Pleas, the record demonstrates several postponements which were requested by, and therefore count against, Appellant. The first was February 13, 2015, to June 1, 2015, followed by a separate postponement request on June 1, 2015, to August 10, 2015. This is a total of 178 days. Added to the earlier period of delay, Appellant caused 247 days of delay, which is not included in the Rule 600(A)(1) calculation.

Therefore, as of August 10, 2015, a total of 405 days had elapsed from the complaint date of July 1, 2014, with Appellant causing 247 days of delay. Thus, the remaining 158 days are all attributable to the Commonwealth. *See Commonwealth v. Mills*, 162 A.3d 323 (Pa. 2017) (normal progression of criminal case does not ordinarily constitute delay for purposes of Rule 600). Subtracting those 158 days from 365, the Commonwealth had 207 days from August 10, 2015 to try Appellant, or until March 4, 2016.

Trial did not commence until April 18, 2016, which is forty-five days after March 4, 2016. Therefore, Appellant's Rule 600 rights were violated unless some other block of time is not included in the calculation.

We now return to the trial court's opinion, which held that the Commonwealth exercised due diligence in attempting to locate a witness, thereby excusing some of the delay. Trial Court Opinion, 12/29/16, at 17 ("The Commonwealth requested a continuance to locate a material witness that was necessary to accurately testify to the events of the murder. The Commonwealth, at a pretrial hearing, also put on evidence of its due diligence in trying to locate that witness."). On this point, we agree.

The trial court opinion does not parse out the precise number of days included in these calculations, but we are satisfied that its ultimate conclusion is sound. It is well-settled that the Commonwealth does not cause periods of delays when a necessary witness becomes unavailable. *See*

***Commonwealth v. Hyland***, 875 A.2d 1175, 1191–92 (Pa.Super. 2005) ("The Commonwealth cannot be held to be acting without due diligence when a witness becomes unavailable due to circumstances beyond its control."). Additionally, the certified record shows that the Commonwealth filed a motion on August 7, 2015, three days before the August 10, 2015 trial date, seeking an arrest warrant for Miccah Green as a material witness. On March 25, 2016, the Commonwealth filed a motion representing that it could not locate Mr. Green, and sought permission to introduce the preliminary hearing transcript due to his unavailability. At the Rule 600 hearing, Detective Ryan Neal testified to his efforts in locating Mr. Green, including visiting Mr. Green's mother, multiple addresses where Mr. Green might be, showed pictures to his neighbors, and contacted the Federal Marshals for assistance in the search. The trial court credited his testimony, and found that the Commonwealth exercised due diligence. We agree. Hence, for purposes of due diligence as a matter of law, the time during which the Commonwealth attempted to locate Mr. Green is not included in the Rule 600 calculation.[3] Thus, at minimum, the time period from August

_____

[3] Appellant argued at the Rule 600 hearing that this period of time should count against the Commonwealth, since it ultimately filed a motion seeking to introduce his preliminary hearing testimony. In light of the fact that Appellant now alleges it was reversible error to introduce Mr. Green's testimony, we can hardly fault the Commonwealth for trying to locate its witness. Furthermore, it would be difficult for the Commonwealth to
*(Footnote Continued Next Page)*

10, 2015, when the case was postponed, to March 25, 2016, when the Commonwealth asserted Mr. Green was unavailable as a matter of law due to its inability to locate him, is not included in the Rule 600 calculation. Accordingly, Appellant's Rule 600 rights were not violated.

The second issue attacks the sufficiency of the evidence supporting the convictions. We fully adopt the trial court's discussion of this issue, which correctly sets forth the standard of review, the elements of the crimes, and carefully reviews the evidence presented to the jury and the inferences that could be drawn from that testimony. *See* Trial Court Opinion, 12/29/16, at 8-11.

Issue three relates to the admission of Alyssa Honaker's testimony. This claim assails the trial court's decision to admit hearsay testimony from Alyssa Honaker, who testified that a group of men, which included Appellant, asked the victim "why he ripped off their friend and what happened to all the money and everything." N.T., 4/18-21/16, at 125. The victim argued with the group, and in response one of the men "yelled from the back that if they ever seen him out the south again they were going to shoot him." *Id*. The trial court permitted this testimony over Appellant's hearsay objection.

*(Footnote Continued)* ───────────

establish Mr. Green's unavailability if it took no efforts to secure his presence.

- 15 -

Our review of a trial court's evidentiary ruling applies the following standard.

> The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

***Commonwealth v. Mickel***, 142 A.3d 870, 874 (Pa.Super. 2016).

Appellant insists that this evidence fell under Pa.R.E. 404(b) as evidence of a prior bad act. Such challenges are subject to these principles.

> Under the Pennsylvania Rules of Evidence, evidence of other bad acts or crimes that are not currently being prosecuted against the defendant are not admissible against the defendant to show his bad character or propensity to commit criminal acts. However, evidence of other [acts] may be admissible where that evidence is used for some other purpose. Such purposes explicitly include "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

***Commonwealth v. Diehl***, 140 A.3d 34, 41 (Pa.Super. 2016) (citations omitted).

Assuming *arguendo* that Appellant is correct that the statement in question can accurately be characterized as falling under Pa.R.E. 404(b), we agree with the trial court that the evidence was admissible as tending to show motive or intent, or, in the alternative, that the evidence "demonstrates the sequence of events and the natural history of the murder

as *res gestae*."[4]  We adopt the analysis set forth in the opinion.  **See** Trial

Court Opinion, 12/29/16, at 11-12.[5]

Next we address Appellant's challenge to the weight of the evidence.

We have reviewed the trial court's analysis of this issue, and find no error.

**See** Trial Court Opinion, 12/29/16, at 14-15.  Additionally: "When we review

a weight-of-the-evidence challenge,  we  do  not  actually  examine

the underlying question; instead, we examine the trial court's exercise of

discretion in resolving the challenge."  **Commonwealth v. Leatherby**, 116

A.3d 73, 82 (Pa.Super. 2015).  We find no cause to disturb the trial court's

conclusion.

Appellant's fifth issue concerns the admissibility of an out-of-court

identification by Satara Dickey, which took place in the kitchen of Sharae

Badgett's home.  Ms. Dickey tapped her finger on Appellant's picture a few

times, whereupon Ms. Badgett stated, "[T]hat's him right there."  Trial Court

_____

[4]  Appellant also maintains that the hearsay statement was testimonial in
nature.  We disagree.  **See e.g. Crawford v. Washington**, 541 U.S. 36, 51
(2004) (defining the core of testimonial statements as "in-court testimony or
its functional equivalent").  The instant statement is clearly not one that the
declarant would reasonably believe would be for use at a later trial.  **Id**. at
52.

[5]  Appellant's argument emphasizes that someone in the group of men other
than Appellant made the threat.  Assuming that the trial court erred in
admitting this evidence, Appellant has failed to explain how he was
prejudiced by evidence of a threat made by someone else towards the
victim.

Opinion, 12/29/16, at 19 (citing transcript). Evidence of that identification was introduced at trial.

Appellant raised a due process challenge concerning the manner of presentation. The trial court's analysis aptly illustrates why this claim fails. *Id*. at 18-21. Additionally, we note that in ***Perry v. New Hampshire***, 132 S.Ct. 716 (2012), the Supreme Court discussed the right to challenge photo arrays based on suggestiveness under a due process theory:

> In our system of justice, fair trial for persons charged with criminal offenses is secured by the Sixth Amendment, which guarantees to defendants the right to counsel, compulsory process to obtain defense witnesses, and the opportunity to cross-examine witnesses for the prosecution. Those safeguards apart, admission of evidence in state trials is ordinarily governed by state law, and the reliability of relevant testimony typically falls within the province of the jury to determine. This Court has recognized, in addition, a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime.

*Id*. at 720. In the normal case, due process does not require "a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id*. at 728. The trial court's opinion correctly concludes that the detective's method of presentation herein did not amount to "arranged suggestive circumstances."

The sixth issue involves Appellant's attempt to exclude his statements based on a violation of ***Miranda***. The trial court concluded that Appellant's claim was waived due to vagueness.

We agree, and additionally note that Appellant is not entitled to relief even if the issue were properly developed. Appellant claims that suppression was required

because there is ambiguity as to the circumstances in which Appellant was interrogated. The Appellant was charged with Unlawful Possession of a Controlled Substance with the Intent to Deliver, Criminal Conspiracy of Unlawful Possession of Controlled Substance With the Intent to Deliver, and Prohibited Offensive Weapons docketed at 3468 CR 2014 based on evidence seized by law enforcement from Appellant's residence at the same time the Appellant was arrested for the above-captioned matter. The Appellant did not validly waive his *Miranda* rights because the Appellant did not have an awareness of the general nature of the transaction giving rise to the investigation.

Appellant was interrogated by Detective Neal. The execution of the search warrant of Appellant's residence resulted in the discovery of marijuana and a .12 gauge shotgun. Appellant was subsequently charged with 3468 CR 2014 as a result of the search warrant. At the time of the execution of the search warrant, Appellant waived his *Miranda* warnings according to Detective Neal. However, Detective Neal was not sure if the Appellant knew why the Detective was interrogating him. **Was the Appellant waiving his *Miranda* rights regarding the firearms and marijuana in his residence or for a separate incident? That question was not definitively answered by the Commonwealth**.

Appellant's statements should have been suppressed because the Detective was not clear as to why they were interrogating the Appellant and Appellant did not adequately waive his *Miranda* warnings.

Appellant's brief at 30-31 (footnotes and citations to transcript omitted, emphasis added).

As emphasized, the essence of this argument is that Appellant may have been confused as to whether the detectives intended to ask him

questions about the instant homicide, or the entirely separate charges regarding drugs and weapons. However, the validity of a **_Miranda_** waiver does not depend upon whether the suspect knows the precise topics the police intend to raise. The United States Supreme Court made that point plain in **_Colorado v. Spring_**, 479 U.S. 564 (1987). Therein, Spring was arrested for firearms violations and given **_Miranda_** warnings. Agents questioned him about the weapons incident. However, the agents had information that Spring was involved in a murder, and began questioning him about that topic. The High Court rejected the precise claim Appellant now makes:

> Spring argues that his March 30 statement was in effect compelled in violation of his Fifth Amendment privilege because he signed the waiver form without being aware that he would be questioned about the Colorado homicide. Spring's argument strains the meaning of compulsion past the breaking point.
>
>     . . . .
>
> Spring's waiver of his Fifth Amendment privilege was knowingly and intelligently made: that is, that Spring understood that he had the right to remain silent and that anything he said could be used as evidence against him. The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The **_Miranda_** warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.

**_Id_**. at 573-74.

- 20 -

Issue seven is related to the Rule 600 claim. As previously described, the Commonwealth introduced the preliminary hearing testimony of Miccah Green, who was an eyewitness to the homicide, as substantive evidence. The trial court granted the Commonwealth's motion seeking to introduce that testimony due to his unavailability, which Appellant states is reversible error.

We agree with the trial court's analysis of this issue. *See* Trial Court Opinion, 12/29/16, at 21-23. The opinion analyzes ***Commonwealth v. Bazemore***, 614 A.2d 684 (Pa. 1992), which held that an unavailable witness's preliminary hearing testimony was not admissible due to the fact the Commonwealth failed to disclose a prior inconsistent statement that related a different version of events. The trial court opinion concludes that Appellant had a full and fair opportunity to cross-examine Mr. Green, as explained in ***Bazemore***, and thus the introduction of his prior testimony did not offend constitutional norms. We therefore adopt its analysis as our own.

Appellant attempts to undercut the trial court's resolution by claiming that he did not have a full and fair opportunity as contemplated by ***Bazemore*** because Mr. Green gave two statements to the police, only one of which was recorded and transcribed. However, Appellant does not claim that he was unaware of the substance of the statements, and the transcript from the preliminary hearing reveals that counsel knew of both:

Q.  How many statements did you give to the police? Did you give two statements?

A.  Yes. I gave.-- well, at the time because I was like traumatized that it was like crazy. So I wasn't being like I wasn't being like I wasn't being up and out and saying the right things because I was afraid like.

N.T., Preliminary Hearing, 9/26/14, at 26. Additionally, Appellant does not discuss the purported inconsistencies between his statements.

Furthermore, Appellant claims that he did not possess Mr. Green's criminal history at the time of the hearing, but he does not allege that Mr. Green was convicted of any offenses that could be introduced as *crimen falsi*. Finally, Appellant complains that he was not able to cross-examine Mr. Green "on how his medical condition could have affected his ability to recollect[.]" Appellant's brief at 43. As noted in our discussion of the next issue, there is no evidence that Mr. Green's medical condition actually affected his ability to recall, nor is there any indication the Commonwealth was aware of Mr. Green's medical condition at the time of the hearing. ***See Bazemore***, ***supra*** at 688 ("[W]here, as here, the Commonwealth **knows**, but does not disclose . . . ") (emphasis added).

This claim addresses the following stipulation read by the trial judge to the jury:

[T]his regards the testimony of Miccah Green, the missing witness. On August 21, 2014, Miccah Green suffered numerous seizures. This caused Miccah to be hospitalized for four days. During the hospital stay, it was determined that Miccah had a right posterior temporal lobe lesion, I'm sorry, on his brain. At

that time, Miccah was placed on psychotropic medications for his medical condition.

On October 9, 2014, Miccah suffered from two seizures and was again hospitalized. On October 14, 2014, Miccah underwent a right temporal Stealth craniotomy for tumor resection. On October 21, 2014, Miccah sought treatment for a post-operative craniotomy headache. Miccah has received follow-up care and was placed on numerous medications for his medical condition.

**Nothing in these medical records indicates any difficulty or abnormality with memory, perception, or cognition**.

N.T., 4/18-21/16, at 236-37 (emphasis added).

Appellant supplied all of the language in this stipulation with the exception of the emphasized language, which was written by the Commonwealth. Despite stipulating to the emphasized language, Appellant complains that the trial court committed reversible error by "imposing an ultimatum . . . that the trial court would only enter the stipulation if the Commonwealth's unfounded expert opinion could be included." Appellant's brief at 44. We find this claim waived.

Briefly stated, Appellant's proposed stipulation represented an attempt to address his inability to cross-examine Mr. Green. The Commonwealth refused, highlighting possible confusion. The prosecutor argued that if the jury was told Mr. Green "had a brain tumor without any kind of explanation or any kind of context, that's just going to lead to more jury confusion[.]" *Id*. at 224. "I went through [the records], I didn't see anything in there about how his memory was affected, his cognition was affected, or anything

along those lines. I think we're just kind of opening up a can of worms if we just put in that information about the medical records without any kind of explanation." *Id*. at 224-225.

The trial court agreed that the jury would not understand the significance of the stipulation, as indicated by the following exchange:

> [APPELLANT] . . . All I would like for to be introduced — Again, not expert. I'm not asking for an expert to be here. I do not want them to review the records. There's no need for that. I just – I am at such a disadvantage to be able to cross-examine or have Miccah answer questions, as the Commonwealth is.
>
> THE COURT: Even with these records, the stipulation you propose, how do we explain to the jury what a right temporal Stealth craniotomy for tumor resection is? What's that?
>
> [APPELLANT]: I don't know. That's what the medical records say and –
>    . . . .
>
> THE COURT: In another section, you say he had a right posterior temporal lobe lesion.
>
> [APPELLANT]: Yes.
>
> THE COURT: What the heck is that?
>
> [APPELLANT]: Judge, again –
>
> THE COURT: We don't have any medical testimony to describe this. If you're the proponent, I think you need to call someone to explain what the heck this is, someone who has reviewed the records and says, well, this is what a temporal lobe lesion is, this is what a craniotomy is, a stealth craniotomy.

- 24 -

*Id*. at 229-30. Shortly thereafter, Appellant stated that he'd like an opportunity to have an expert review the records, which led to the stipulation.

> [COMMONWEALTH]: [W]e would be okay with the stipulation as long as our proposed amendment were made part of it because I think that helps eliminate some of the confusion.
>
> It's not a medical conclusion that we propose. It's simply a statement of what the medical records do not include. You know, we're listing several things that they do include for the purpose of raising the inference that he must have had some kind of cognitive impairment, but the records don't say that. So I think in fairness, if the medical terminology is going to be introduced, it should be introduced in conjunction with a statement that says nowhere in the medical records does it indicate that he — that this – these conditions that are being described had an impact on his memory or cognition.
>
> THE COURT: All right. So you're okay with the stipulation as long as that final sentence is added?
>
> [COMMONWEALTH]: Yes, Your Honor.
>
> THE COURT: The addenda.
>
> [APPELLANT]: Judge, if in the Court's discretion that would allow the stipulation to come in, I don't concede that, **I would object to that, but that would be acceptable and that would be okay** just as far as my stipulation.

*Id*. at 231-32 (emphasis added).

The trial court opinion holds that Appellant is not entitled to relief because the inserted language simply informed the jury there was no indication of any cognitive impairment or inability to recall, as opposed to an opinion definitively stating Mr. Green did not suffer from those afflictions.

We agree with that analysis; however, we find that Appellant waived his claim by accepting the stipulation. His statement, "I would object to that, but that would be acceptable" is legal and logical nonsense. Appellant had the option of refusing the Commonwealth's language, thereby preserving a claim that he was legally entitled to introduce his own language as evidence. By stating that the Commonwealth's language was acceptable, he abandoned any objection.

Relatedly, Appellant fails to recognize that the medical records themselves were subject to the Rules of Evidence, and, as the trial court correctly pointed out in the quoted discussion, Appellant was the proponent of that evidence. He was free to ignore the Commonwealth's conditional stipulation and attempt to introduce the evidence in a manner consistent with the Rules of Evidence. He elected to forego that opportunity, thereby waiving this claim.

The ninth issue relates to the following statement by Police Officer Karen Lyda during her testimony regarding the execution of a search warrant at Appellant's residence:

Q. Were there any items of interest found during the execution of the search warrant?

A. Yes. There was a .9 mm handgun, a .22 caliber rifle, a .12 gauge shotgun.

[COMMONWEALTH]: If I may approach the witness.

[APPELLANT]: Judge, may we approach?

THE COURT: Sure.

(A discussion was held off the record at sidebar).

N.T., 4/18-21/16, at 94.

Shortly thereafter, the jury was excused for the day. Appellant then stated that he "moved for a mistrial based on evidence in a previous conviction" at the sidebar, apparently referring to the fact that Appellant was charged and separately convicted for possessing those firearms. *Id*. at 99-100. The Commonwealth stated that a limiting instruction could be issued if Appellant desired. Appellant rejected that alternative, stating it would simply highlight the information. He then requested a mistrial, which was denied. We begin by noting our standard of review.

> It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will . . . discretion is abused. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice.

*Commonwealth v. Brooker*, 103 A.3d 325, 332 (Pa.Super. 2014).

We find no abuse of discretion. In the context of mistrials based on references to prior criminal activity, we have observed:

> The admission of testimony from which a jury could infer past criminal conduct has been held to be reversible error. Reversal is not warranted, however, unless the record indicates that prejudice resulted from the testimony. Mere "passing references" to criminal activity do not necessitate the granting of a mistrial unless prejudice results from the reference.

*Commonwealth v. Bruner*, 564 A.2d 1277, 1287 (Pa.Super. 1989) (citations omitted).

Herein, Appellant analogizes the reference to the shotgun to "past criminal conduct", due to the fact Appellant was convicted of crimes relating to his possession of the shotgun. We disagree. The officer's remarks did not inform the jury of "past criminal conduct," as nothing in her response referred to a conviction. Furthermore, the reference was fleeting, and, as the trial court noted, possession of a shotgun is not *per se* illegal. We find no inherent prejudice in the remark, and, as a result, the trial court had no basis to grant a mistrial.

We now address Appellant's last issue, which involves the trial court's denial of Appellant's pre-trial motion in *limine* to exclude introduction of a .9mm firearm found at Appellant's residence.[6] While a .9mm firearm was

---

[6] Appellant's brief refers to the testimony at trial, naturally suggesting that the matter came up during the trial itself. At no point does Appellant mention the suppression hearing held on June 15, 2015, regarding this claim. We again direct appellate counsel to Pa.R.A.P. 2119(c).

used to kill the victim, it is undisputed that the firearm recovered was not the murder weapon.

At the pre-trial hearing, the parties discussed the applicability of *Commonwealth v. Broaster*, 863 A2d 588 (Pa.Super. 2004), which the Commonwealth continues to rely on in its brief. The trial court, in contrast, held that the .9mm was admissible pursuant to *Commonwealth v. Williams*, 640 A.2d 1251 (Pa. 1994).

Before discussing those precedents, we add the following facts. At trial, Officer Lyda testified that she recovered evidence at the scene, which included "Remington brand .9mm casings, [Exhibit] 14 was a .9mm TulAmmo casing; and [Exhibit] 16 were two casings there, one was a Blazer and one was a Federal, both .9mm." N.T., 4/18-21/16, at 82. At Appellant's residence, Officer Lyda testified that the .9mm handgun had the following brands of ammunition inside: "[F]ive Remington, two Federal, and one Winchester." *Id*. at 96. The Commonwealth then introduced the .9mm handgun into evidence.

The trial court held that the weapon was admissible pursuant to *Williams*, which states:

> A weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime. Any uncertainty that the weapon is the actual weapon used in the crime goes to the weight of such evidence.

*Id*. at 1260. However, our Supreme Court subsequently disapproved of that expansive holding in **Commonwealth v. Christine**, 125 A.3d 394 (Pa. 2015). The **Christine** Court said that a weapon not specifically linked to the crime may be admitted if the prosecution "lay[s] a foundation that would justify an inference by the finder of fact of the likelihood that the weapon was used in the commission of the crime." **Id**. at 400 (citation omitted). However, the Court limited that principle when it was certain that the weapon was **not** used in the crime:

> The cases cited deal with weapons that might have been used. Possession of a handgun may be relevant even if the particular gun possessed cannot be proven to be the one used in the crime. That it was possessed may allow the inference it could have been used. **Here, however, the exception is not in play, as the shank was admittedly not used in the pertinent assault**. The theory of the exception is that the weapon possessed could have been the weapon used—that simply is not the case here, and admission under the similar-weapon exception was error. To the extent that cases affirm use of this exception strictly on the basis of similarity, without an inference they were the weapons used, we reject them.
>
> Of course, admission on other grounds remains possible. . . .

*Id*. at 400-01 (emphasis added, footnote omitted). Accordingly, we do not agree with the trial court's analysis.[7]

---

[7] Chief Justice Saylor filed a dissenting opinion, as he would have reversed on an alternative ground. However, with respect to the weapons issue, the Chief Justice noted that there is a distinction between illegal and legal weapons, as the former category is subject to Pa.R.E. 404(b).
*(Footnote Continued Next Page)*

*Christine* did not cite *Broaster*, which the Commonwealth relies on herein and which involved the admission of a handgun that, like the instant weapon, was not the murder weapon. In *Broaster*, a murder was committed with a .45 caliber firearm. Broaster was identified as a suspect and, during a vehicular pursuit, Broaster discarded a .45 caliber firearm. Forensic testing ruled out the discarded firearm as the murder weapon. *Id*. at 591. However:

> the tests also revealed that this gun had been loaded in the same signature style as had the .45 semi-automatic used to kill Kenneth Kemp. Specifically, both guns had been loaded with three bullets manufactured from the Federal Company, and three bullets from various other makers.

*Id*. at 591. We held that the trial court did not abuse its discretion in admitting the firearm, because the gun was relevant to connect Broaster to the murder.

> Specifically, the gun tended to prove that (1) Appellant readily obtained handguns of the same caliber used in the murder, (2) readily discarded handguns, (3) preferred to load his gun with the same number of bullets used on the victim, and (4) preferred the same distinctive combination of bullets fired at the victim.

*Id*. at 592–93.

*(Footnote Continued)* ───────

Simultaneously, the Chief Justice reiterated his belief that "the presentation of other-weapons evidence is attended by a fairly high risk of undue prejudice, and, therefore, courts should refrain from sanctioning admission absent a strong and legitimate probative purpose justifying its introduction." *Id*. at 408, n.2 (citation omitted) (Saylor, C.J., dissenting).

*Broaster* therefore did not apply the "similar weapon" rule disavowed in *Christine*. The present case is not fully aligned with *Broaster*, in that the .9mm handgun herein contained three different types of ammunition, two of which were found at the crime scene. However, the use of several different types of casings was deemed relevant in *Broaster*, and we find it relevant here, too.

Finally, as in *Broaster*, the jury was informed that the weapon was not the murder weapon, as the trial court issued this instruction in closing:

> [T]here was evidence about a .9 mm firearm found in the Defendant's home. The Commonwealth had a purpose of — their argument was that shows he might have access to a weapon and so forth, but that particular weapon in question is not the murder weapon, everyone concedes that, and it's not to be considered as such. So there's no crime in him having a firearm in his home. That's not a crime in Pennsylvania. It was introduced for that certain purpose and that purpose alone.

N.T., 4/18-21/16, at 343-44. Thus, to the extent the trial court erred in admitting the evidence, *Broaster* suggests any prejudicial effect was significantly diminished by this instruction. No relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/13/2018

- 32 -